UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────────────────

WILSON ALEJANDRO MEJIA–VELEZ,

               Petitioner,

   – against –                     **MEMORANDUM & ORDER**

UNITED STATES OF AMERICA,             13-CV-3372 (ERK)

               Respondent.
───────────────────────────────────────────

KORMAN, *J*.:

On March 11, 1992, Manuel de Dios Unanue, a journalist and former editor of New York's largest Spanish daily, was having a drink at a restaurant in Queens when he was shot twice in the head. *United States v. Mejia–Velez*, 855 F. Supp. 607 (E.D.N.Y. 1994). De Dios was murdered at the direction of the Cali cartel, an association of drug-dealing families based in Cali, Colombia. Because of his scathing exposés on the cartel, de Dios was singled out for execution by the head of one of the families, who issued a contract offering $50,000 for de Dios's death.

Ultimately, the assassination was assigned to Jose James Benitez and Elkin Farley Salazar. Although Benitez and Salazar were willing to conspire, the two sought a third man to pull the trigger. Salazar suggested (and Benitez agreed on) a seventeen-year-old acquaintance of Salazar's, Wilson Alejandro Mejia–Velez. Benitez and Salazar enlisted Mejia because Mejia wanted to do criminal work and because he had boasted that he had already participated in homicides in Colombia.

The day of the murder, the three men—Benitez, Salazar, and Mejia—were given the details of the hit, shown a photograph of de Dios, and taken to a restaurant in Queens called

Meson Asturias, where de Dios was a frequent patron. Benitez and Mejia went inside to get a view of their target, and, satisfied that they had seen de Dios at the bar, the men left to prepare.

Salazar procured the weapon, a nine-millimeter Beretta. Mejia cleaned the gun, covered his fingers with tape, and donned a grey hooded sweatshirt. The three then returned to Meson Asturias and parked nearby. While Salazar and Benitez stayed in the car, Mejia went in with the gun. When Mejia returned, he announced that it was "done," and the three men drove off. *Id.* at 608–10.

Benitez and Salazar pleaded guilty. Mejia was convicted at trial, and I gave him a Guidelines sentence of life in prison because I believed a downward departure was unwarranted. About two decades later, the Supreme Court in *Miller v. Alabama* struck down a statute mandating that juveniles be sentenced to life in prison without the possibility of parole. 567 U.S. 460 (2012). Mejia was seventeen when he murdered de Dios, had been sentenced to life, and had no possibility of parole because Congress had abolished it at the federal level. Mejia thus petitioned for resentencing under *Miller*, *see* 28 U.S.C. § 2255, arguing that the life sentence I had imposed was mandated by the Guidelines—"mandated" even though judges had regularly departed from Guidelines sentences using discretion that the Guidelines themselves granted. A few years later, in *Montgomery v. Louisiana*, the Court made *Miller* retroactive on collateral review. 136 S. Ct. 718 (2016). In doing so, *Montgomery* reframed *Miller*, holding not only that *Miller* prohibited mandatory life sentences that forbid consideration of youth, but also that *Miller* actively required sentencers to consider youth. Now, in light of *Miller* and *Montgomery*, I consider whether Mejia is entitled to resentencing.

**I.     MEJIA'S PROSECUTION AND SENTENCING**

*The Transfer Hearing*

Because the United States Attorney moved to try Mejia as an adult, I held a hearing that primarily comprised the testimony of a psychologist, hired by the defense, who had examined Mejia over about seven hours. *See generally* Tr. of Crim. Cause for Transf. Hr'g, Dkt. 17. The psychologist also submitted written reports, in which he diagnosed Mejia (IQ: 79) with ADHD, a developmental reading disorder, an adjustment disorder, and borderline intellectual functioning. Transf. Hr'g Ex. at 4, 9, Dkt. 18. In short, "both intellectually [and] emotionally," Mejia was "not where you would expect your typical 17 year old to be." Transf. Tr. 25–26. During the hearing, I asked the psychologist whether it was fair to treat Mejia as an adult:

> [O]ne of the underlying strains that goes through the law is whether it's fair to treat him as an adult … arguably it would be different if he were 11 years old—he was 17—because we might say people at that age don't develop the kind of ability to reason and make moral judgments for which they should be arguably held accountable as an adult ….
>
> [S]o there's that strain that may run through all of this about the ultimate fairness of all of this. I mean, but he's 17 years old, he was when he allegedly committed this crime, and he was bordering on the age that Congress thought separated adults from juveniles.
>
> I mean, do any of these factors that you've identified in your mind, given his age, go to the fairness of holding him accountable as an adult?

*See* Transf. Tr. 21–22. The psychologist responded that if Mejia had committed murder for hire, "then some of these [developmental] issues [had] very little do to with [what was] fair." *Id.* at 23. Certainly Mejia's disorders did not themselves cause him to kill. *Id.* at 29–32. Rather, in the psychologist's opinion, "the generally accepted idea" was that a person who would murder solely for money and without remorse had not "develop[ed] an empathic capacity for other

3

individuals": there is "nothing to be remorseful about because [they] can't put [themselves] in somebody else's shoes." *Id.* at 32.

The defense psychologist also testified that when "the individual's sole motivation was financial, and the individual is in fact remorseless about that … the prospects for rehabilitation are quite dim." *Id.* at 19–20. The point came through more than once:

> And isn't it also a fact that in terms of persons that demonstrate an ability to engage in remorseless acts of violence without the ability to really have a reaction as to whether it is something that's incorrect, aren't the rehabilitative prospects for those person[s] especially dim?

*Id.* at 36. "They are dim," the psychologist conceded. *Id.*

Ultimately, I considered Mejia's "age and the nature of the offense, [his] social background and the extent of his … intellectual and psychological maturity." *Id.* at 42. I quoted legislative history regarding the juvenile-delinquency statute, explaining that recent amendments provided "authority to prosecute the most serious instances of juvenile criminal conduct, yet at the same time preserve[d] the principles that criminal prosecution should be reserved [for only] the most dangerous juvenile offenders." *Id.* at 41 (quoting S. Rep. No. 98-225, at 391 (1983)). So long as the allegations of murder for hire were true, given what I had heard "about individuals who commit such crimes," I thought Mejia was "one of the [most] dangerous juvenile offenders, someone who would take the life of another person simply … to earn a few thousand dollars." *Id.* I was dealing not only "with a serious and violent crime, but even accepting the social background of the defendant … [and his] intellectual development and psychological maturity," I agreed that "the prospect of rehabilitation, even assuming the availability of appropriate treatment centers, [was] dim, if [not] non-existent." *Id.* at 42. The psychologist's testimony "establishe[d] that quite clearly." *Id.* I transferred Mejia to adult proceedings, *id.* at 43, where he was convicted.

4

*Mejia's Sentencing*

After Mejia's conviction, I proceeded without a pre-sentence report because the trial and the hearing had already produced an "extensive" record. *See* Tr. of Crim. Cause for Sentencing Hr'g 5–6, Dkt. 8, Attachment; *see also* Fed. R. Crim. P. 32(c)(1). There was, I said, "sufficient information in the record to enable a meaningful exercise of … sentencing authority pursuant to 18 U.S.C. § 3553"—indeed, "far more … than would be brought to my attention in the average presentence report." Sentencing Tr. 5–6. The parties then presented their positions on sentencing, which turned on whether there was a basis to depart from the calculated life sentence.

At the time, "[a]ge (including youth) [was] not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.1 (1993). By using the word "ordinarily," this policy statement did not preclude altogether a downward departure based on age. As one commenter observed, "whenever the Sentencing Commission uses the term 'not ordinarily relevant,' it leaves the door open for departure arguments … when it can be shown that a given factor is present to an unusual or extraordinary degree." Tony Garoppolo, The Sentencing Reform Act: A Guide for Defense Counsel 131 (3d ed. 2003). Similarly, the Guidelines' refusal to allow departures for "[l]ack of guidance as a youth" did not preclude in unusual circumstances departures based on youth itself, a distinct concept. *See* U.S.S.G. § 5H1.12 (1993); *cf. United States v. Haynes*, 985 F.2d 65, 66, 68–69 (2d Cir. 1993) (refusing only to consider lack of guidance as a youth in the sentencing of *adults* who failed to make out any of its elements). In fact, the Guidelines have since been amended to include nearly the commenter's exact language. The section now provides that "[a]ge (including youth) may be relevant in determining whether

5

a departure is warranted, if considerations based on age … are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1 (2016).

This analysis is underscored by the rule in *Koon v. United States* that the Guidelines "did not eliminate all of the district court's discretion." 518 U.S. 81, 92 (1996) (Kennedy, J.). "Congress allow[ed] district courts to depart from the applicable Guideline range if 'the court f[ound] that there exist[ed] an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.'" *Id.* (quoting 18 U.S.C. § 3553(b) (1994)); *see also United States v. Stinson*, 508 U.S. 36, 42 (1993) (Kennedy, J.); *United States v. Rivera*, 994 F.2d 942, 947–49 (1st Cir. 1993) (Breyer, J.) And, indeed, judges did regularly depart downward around this time.[1] I myself that year departed downward (for reasons other than substantial assistance) in 32.8 percent of sentencings. And in another murder case with a Guidelines sentence of life imprisonment, I departed downward and imposed a sentence of about 24 years. *United States v. Soto*, 98-CR-845, Dkts. 44, 70, 79 (E.D.N.Y., case filed Aug. 27, 1998). In short, a primary point of Mejia's sentencing was to discuss possible departures from the Guidelines range.

Even though the Guidelines provided only that age was not "ordinarily" relevant, Mejia's counsel did not argue that any age-based considerations were unusually present. Sentencing Tr. 14. She did, however, discuss Mejia's youth tangentially in two downward departures she requested: mostly in a downward departure because Mejia's youth would make him vulnerable

---

[1] *See* United States Sentencing Commission, *Annual Report 1994* App'x B (listing that in fiscal year 1994 judges in the Eastern District of New York departed downward on grounds other than substantial assistance in 15.1 percent of cases); *Sourcebook 1996* at tbl. 27 (listing that in 1996 district courts nationally departed downward on grounds other than substantial assistance in 18.9 percent of murder cases). The departures for substantial assistance were expressly authorized by the Guidelines when the U.S. Attorney moved for a downward departure. *See* U.S.S.G. § 5K1.1 (1993, 1995).

6

in prison, and perhaps also in a downward departure based on his "emotional and intellectual limitations." *Id.* at 3. She also mentioned that life sentences tend to last longer for young people. *Id.* at 5. I rejected the departures. *Id.* at 16. I thought that Mejia (although he had probably not known de Dios's profession and was indifferent to whom he killed) "not only [had] snuffed out in cold blood the life of another human being," but, by killing a journalist for what he had published, had also "endangered the very constitutional rights that underlie our free society." *Id.* at 17. I sentenced him to life in prison without parole. *Id.* at 17–18. I had no doubt that I *could have* sentenced Mejia to something less, but I chose not to because it was not "a case for a downward departure under any circumstance." *Id.* at 16.

## II. *MILLER* AND *MONTGOMERY*

Eighteen years later, in *Miller v. Alabama*, the Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. 460, 479 (2012). Such a forbidden scheme bars consideration of youth's "hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. It bars consideration of "the family and home environment … no matter how brutal or dysfunctional." *Id.* "It neglects the circumstances of the … offense." *Id.* And it "disregards the possibility of rehabilitation." *Id.* at 478. In sum, "such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479.

*Miller* held that a transfer hearing—a hearing on whether to transfer a juvenile to adult proceedings—could not provide the required consideration of youth. *Id.* at 487–89. "Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as

7

a child or standard sentencing as an adult." *Id.* at 488. "For that reason, the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court." *Id.* at 489. Significantly, however, the Supreme Court did not hold that a sentencing judge could not rely on evidence introduced at the transfer stage.

Nor did *Miller* "categorically bar a penalty for a class of offenders or type of crime"; it did not rule out life without parole for juveniles. *Id.* at 483. Indeed, in responding to two dissents' comparison of the fourteen-year-old defendants in *Miller* with seventeen-year-olds, the majority noted that an individualized sentencing would attend to "the 17-year old [who] is convicted of deliberately murdering an innocent victim." *Id.* at 480 n.8. Rather, *Miller* held only that "*mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment[]." *Id.* at 465 (emphasis added). The Court's concern was procedures in which a sentencer had no say, *state-law* procedures like the one at issue laid down by Arkansas: "A defendant convicted of capital murder or treason *shall be* sentenced to death or life imprisonment without parole"—full stop. *Id.* at 466 (quoting Ark. Code Ann. § 5–4–104(b) (1997)) (emphasis added).

Nonetheless, based on *Miller* (and before *Montgomery*), Mejia filed a petition for resentencing. *See* 28 U.S.C. § 2255. Per *Miller*, "the Eighth Amendment 'forbids a sentencing scheme that mandates life in prison for juvenile offenders,'" and, according to the petition, I had "imposed a term of mandatory life under the" Guidelines. Mot. to Vacate the Sentence Pursuant to 28 U.S.C. § 2255 7, Dkt. 1 (quoting *Miller*, 567 U.S. 460, at syllabus). The U.S. Attorney agreed, with the caveat that I need not resentence Mejia if I concluded that I would have imposed a life sentence no matter what. Gov't's Mem. in Supp. of Mot. to Vacate 6, Dkt. 8. At the time, however,

8

it was still a question whether *Miller* applied retroactively in collateral challenges such as Mejia's. *See Teague v. Lane*, 489 U.S. 288, 299–310 (1989) (O'Connor, J.) (plurality opinion).

The Supreme Court answered that question in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). Usually only new "substantive rules of constitutional law" apply "to convictions that were final when [a] new rule was announced." *Id.* at 728. Despite *Miller*'s self-description that it required "only that a sentencer follow a certain *process*," the Court concluded that *Miller* had announced a new substantive rule. *Id.* at 734 (emphasis added). To do so, the Court presented, as Justice Scalia's dissent contended, a rewriting of *Miller* that deemed irrelevant whether the life sentence had been mandatory. *Id.* at 743 (Scalia, J., dissenting). According to *Montgomery*, *Miller* not only "require[d] a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Id.* at 734 (quoting *Miller*, 567 U.S. at 472). And even if the sentencer considered age, life without parole still "violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Id.* (quoting *Miller*, 567 U.S. at 479).

Despite the U.S. Attorney's concession, whether *Miller* and *Montgomery* required resentencing remained unsettled to me. In a less weighty matter, I might have accepted the concession. The murder of Manual de Dios Unanue, however, was dreadful, and committed by a remorseless hired gun. Yes, Mejia's interest in resentencing was significant, but there was an interest, too, in finality, "which is essential to the operation of our criminal justice system." *Teague*, 489 U.S. at 309 (plurality opinion). Finality "promotes the law's deterrent effect; it provides peace of mind to a wrongdoer's victims; it promotes public confidence in the justice system; it conserves

9

limited public resources; and it ensures the clarity of legal rights and statuses." *Buck v. Davis*, 137 S. Ct. 759, 785 (2017) (Thomas, J., dissenting). Like Mejia, de Dios, too, had a history, and a family whose twenty-year-old wounds I would not reopen lightly.

To ensure that our adversarial system operated in this circumstance, I appointed Andrew Frey of Mayer Brown LLP as an *amicus curiae* to argue that Mejia was not entitled to resentencing. *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 109 (2d Cir. 2015) (appointing an *amicus* to argue a position not put forth by defaulting defendants). In July 2017, the U.S. Attorney reiterated that Mejia was entitled to resentencing unless the record established that Mejia's life sentence remained appropriate—*i.e.*, that any failure to consider youth was harmless—although even then resentencing would be "prudent." Gov't's Resp. Br. 3, Dkt. 31. With the benefit of these views, I now rule on Mejia's petition. Of the cases Mejia cites that have ordered resentencing in similar circumstances, nearly all have done so without analysis of whether the Guidelines were mandatory under *Miller*. *See* Pet'r's Resp. Br. 13, Dkt. 28; *Amicus*'s Reply Br. 7, Dkt. 34. I thus consider this ruling to be on a nearly blank slate.

### III. THE APPLICATION OF *MONTGOMERY*

The *amicus* has advanced two arguments that *Miller* and *Montgomery* do not require resentencing: that the Guidelines were not mandatory in the sense of *Miller* and that I considered Mejia's youth sufficiently for any construction of *Miller* and *Montgomery*. The *amicus* has convinced me that the Guidelines were not mandatory in the sense of *Miller*.[2] *Miller* required

---

[2] *United States v. Booker*, 543 U.S. 236 (2005), does not control. *Booker* held that the Guidelines were mandatory despite the availability of departures, *id.* at 233–34, but the holding concerned the Sixth Amendment right to have a jury find facts supporting a sentence above that authorized by the facts underlying the conviction, *id.* at 244. *Booker*—"a run-of-the-mill drug case [that did] not present any factors that were inadequately considered by the [Sentencing]

only "discretion at post-trial sentencing in adult court," 567 U.S. at 489, and the Guidelines "did not eliminate all of the district court's discretion," *Koon*, 518 U.S. at 92.

But that is not enough. Everyone—Mejia, the U.S. Attorney, and the *amicus*—agrees that "*Montgomery* makes clear that a sentencing court must consider 'youth and its attendant characteristics.'" *Amicus*'s Reply Br. 9 (quoting *Montgomery*, 136 S. Ct. at 735). Specifically, according to *Montgomery*, "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery*, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 480). And "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Id.* at 734 (quoting *Miller*, 567 U.S. at 479). Per *Montgomery*, *Miller* thus requires that sentencing include a serious consideration of the defendant juvenile's immaturity and whether it is transient. Not, necessarily, an explicit "finding of fact regarding [the] child's incorrigibility," *Montgomery*, 136 S. Ct. at 735, but at least an implicit finding if the juvenile is to be sentenced to life without parole. As another district court considering another well-known case, that of the D.C. Sniper, put it: "whether [the relevant] penalty scheme is mandatory or discretionary" does not matter "because this Court finds that the rule announced in *Miller* applies to all situations in which juveniles receive a life-without-parole sentence." *Malvo v. Mathena*, 254 F. Supp. 3d 820, 827 (E.D. Va. 2017), *appeals*

---

Commission," *id.* at 235—had nothing to do with whether judges sentencing juveniles had discretion in the sense of *Miller*. *Miller* did not once mention the pre-*Booker* Guidelines or acknowledge the frequent departures from Guidelines sentences.

11

*docketed*, *e.g.*, No. 17-6746 (4th Cir. June 12, 2017); *see also United States v. Johnson*, 2016 WL 3653753, at *2 (W.D. Va. June 28, 2016).

Did Mejia's sentencing reflect such consideration? Mejia's counsel explained then that she had not requested a departure because of age because she thought "that [wasn't] permitted under the Guidelines." Sentencing Tr. 14. Although the U.S. Attorney did not argue for a blanket prohibition on considering youth, he did argue that "youth is not a factor which is to be considered … under ordinary circumstances." *Id.* at 9. Other than the latter concession that youth could be considered in other-than-ordinary circumstances, Mejia's age never once arose in the sense of *Montgomery*. It did arise—in passing—as it related to Mejia's requested departure based on his safety in prison and the fact that life sentences are generally longer for young people, but neither Mejia's counsel nor the U.S. Attorney nor I said anything about the heart of *Montgomery*: how youth affects retribution, deterrence, incapacitation, and rehabilitation. 136 S. Ct. at 733. True, I did not think it "a case for a downward departure under *any* circumstance." Sentencing Tr. 16 (emphasis added). The *amicus* is right about that. But immediately thereafter, I referred to an overwhelming aggravating factor—that Mejia was the hired gun in a drug cartel's execution of a crusading journalist. I did not go on to discuss the factors identified in *Miller* and *Montgomery*. *Id.* at 16–19. The short version of Mejia's sentencing is that both parties agreed at least that youth was ordinarily irrelevant, and I did not discuss it.

And this makes sense because, at the time of Mejia's sentencing, the Guidelines said that youth was "not ordinarily relevant." U.S.S.G. § 5H1.1 (1993). Mejia was seventeen when he murdered de Dios, nearly an adult, so I understand why the parties would deem his case "ordinary" regarding age. Perhaps counsel could have anticipated *Miller* and argued that the case

was not ordinary given Mejia's age and the calculated life sentence, but it not surprising that the U.S. Attorney argued and the defense conceded that youth was not relevant to the case. Had *Miller* and *Montgomery* been decided then, Mejia's counsel would not have made that concession. Although she would have had a tough row to hoe, her entire sentencing strategy may have differed.

Still, I sentenced Mejia knowing "the matters and materials that were brought to my attention during the course of the proceedings to determine whether [Mejia] should be treated as an adult or as a juvenile delinquent, which were far more extensive than would be brought to my attention in the average pre-sentence report." Sentencing Tr. 6. Perhaps those transfer proceedings could have reflected the analysis that *Montgomery* demands. Certainly, the decision to transfer Mejia to adult proceedings is not itself sufficient. *Miller* makes that clear: "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court." 567 U.S. at 489. But the Supreme Court did not hold irrelevant the factors underlying a transfer decision, as opposed to the decision itself. And here the *amicus* makes the strong point that I did consider the aspects of youth *Miller* listed because they mirrored the statutory criteria that I considered for treating Mejia as an adult. *Compare Miller*, 567 U.S. at 477–78, *with* 18 U.S.C. § 5302 (1988). Fair enough. I did "touch[] on all of the factors that Congress ha[d] required me to explicitly take into account: his age and the nature of his offense, the social background and the extent of his … intellectual and psychological maturity." Transfer Tr. 42.

But I hesitate to find sufficient just touching on those factors in a non-sentencing proceeding. When I considered Mejia's culpability as a seventeen-year-old, I contrasted him with much younger children and explained that *young* children lack blame: "arguably it would be

13

different if he were 11 years old—he was 17—because we might say people at that age [*i.e.* 11] don't develop the kind of ability to reason and make moral judgments." Transfer Tr. 22. Obviously, as *Miller* recognized, 567 U.S. at 476–77, seventeen-year-olds are and were more blameworthy than much younger adolescents, but *Miller* also makes clear that the line is drawn at eighteen. More important, without any discussion at sentencing of how the facts from the transfer hearing fit into the *Montgomery* framework, I just cannot be sure, twenty-four years later, that I sufficiently considered the facts from a hearing five months before sentencing.

Finally, there is the U.S. Attorney's concession that resentencing is at least prudent and likely required. Of course, there is no rule that "a government concession necessarily results in an opinion adopting the conceded position." *Evans–Garcia v. United States*, 744 F.3d 235, 239 (1st Cir. 2014) (adopting the Government's pre-*Montgomery* concession that, *prima facie*, *Miller* applied retroactively). But facing a close question, I am mindful that "[t]he government plays a central role in criminal law enforcement" and that—to put it mildly—"the government is generally resistant to collateral review of criminal … sentences." *Id.* at 238. Nonetheless, here the U.S. Attorney confessed error in 2014 and has repeated that position as recently as 2017. I am reluctant, faced with a difficult question of criminal administration, to ignore the Executive's consistent view that the law requires resentencing.

## IV. CONCLUSION

At least after *Montgomery*, "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery*, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 480). Mejia may be "the rare juvenile offender who

14

exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." *Id.* at 733. But, for the reasons stated, I feel compelled to vacate the sentence and set the case for resentencing.

In this difficult case, I acknowledge Andrew Frey who, with his associates Andrew Lyons-Berg and Christopher Ferro, provided invaluable assistance as *amicus curiae*. I am grateful for their service.

**SO ORDERED.**

*Edward R. Korman*
Edward R. Korman
United States District Judge

Brooklyn, New York
April 16, 2018